# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

OCA f/k/a ORTHODONTIC CENTERS    :
OF AMERICA, INC. and ORTHODONTIC :
CENTERS OF CONNECTICUT, INC.,    :
       Plaintiffs,              :
                       :    Case No: 3:04cv1517 (PCD)
  vs.                     :
                       :
Thomas E. CHRISTIE and THOMAS   :
E. CHRISTIE, INC.,           :
       Defendants.          :

## RULING ON MOTION FOR SUMMARY JUDGMENT

_____Plaintiffs Orthodontic Centers of America, Inc. ("OCA") and Orthodontic Centers of

Connecticut, Inc. ("OCS") bring this breach of contract action.  Defendants move, pursuant to

Fed. R. Civ. P. 56, for summary judgment, arguing that the contracts at issue are illegal and thus

void and unenforceable.  For the reasons stated below, Defendants' Motion [Doc. No. 27] is

**denied**.

## I.  BACKGROUND[1]

      Defendant Thomas Christie ("Dr. Christie") practices dentistry in Fairfield, Connecticut

through his professional corporation, Defendant Thomas E. Christie, Inc. ("Christie, Inc.").  Dr.

Christie, who specializes in the field of orthodontics, is licensed to practice dentistry in the State

of Connecticut.  Plaintiff OCA is an orthodontic practice management company which provides

affiliated orthodontic practices with a range of operational, purchasing, financial, marketing,

administrative and other business services, as well as capital and proprietary information in order

---

[1]    The statement of facts that follows is derived from the parties Local Rule 56 statements and their
briefs.  Although the case involves numerous facts and claims, only those necessary to the
resolution of this Motion will be discussed here.  To the extent necessary, the facts will be
addressed in more detail in the discussion that follows.

to help them in the day-to-day operations of their businesses.  OCA generally provides its services to affiliated practices under long-term consulting or management service agreements, with terms typically ranging from twenty to twenty-five years.[2]  In addition, the company offers training, office leasing and construction, and information technology support services.  As the court in Orthodontic Affiliates, P.C. v. Orthalliance, Inc., 210 F. Supp. 2d 1054, 1056 (N.D. Ind. 2002), noted, the key to business relationships such as the one at issue here is their long-term nature.  They are "structured in such a manner that the orthodontist's greatest benefit comes in the early years of the arrangement," however, "the management company [eventually] recoups its investment, and ultimately profits from the deal."  Id.  Because of this "mismatch in timing," the court observed, "one could easily envision the symbiosis turning to enmity."  Id.

OCA conducts business in Connecticut through its wholly-owned Connecticut subsidiary, OCS.  OCS and Dr. Christie entered into two agreements, a Stock Purchase Agreement ("SPA") and a Business Services Agreement ("BSA"), through which OCS acquired the physical assets of Dr. Christie's orthodontic practice and agreed to provide practice management services.  Prior to entering into the SPA, certain specified events were required to take place.  Specifically, Dr. Christie converted the old professional corporation, Thomas E. Christie, D.D.S., P.C. (the "Old PC"), into a regular, general business corporation and formed a new professional corporation of which he was the sole owner (the "New PC").  Also prior to entering into the SPA, Dr. Christie transferred, conveyed and assigned to the New PC all of the Old PC's patient records, charts and other professional assets, such as patient contracts, provider agreements and other contracts for the provision of orthodontic treatment.  SPA, Pl's Mem. Opp., Exh. 1 § 2(b) (hereinafter "SPA").

---

[2]        The duration of the agreements at issue in this litigation is twenty-five years.

Before the closing date, the SPA required Dr. Christie to deliver to Plaintiff OCS "such consents as are necessary to effect a valid and binding transfer or assignment so as to enable the Buyer to enjoy all of the rights now enjoyed by the PC under such contracts."  Id. § 4(g).  Pursuant to the SPA, Plaintiffs purchased all of Dr. Christie's shares in the Old PC and acquired Dr. Christie's leasehold interests in his office and his furniture, fixtures and equipment.  As consideration for the sale of stock in the Old PC and for Dr. Christie's agreement under the SPA that he and the New PC would enter into the BSA, under which OCS would provide practice management services for a period of twenty-five years, Dr. Christie received $791,529.00 plus a $35,000 signing bonus. Id. § 1.

The SPA obligated Dr. Christie and the New PC to execute the BSA, pursuant to which OCS agreed to provide Dr. Christie with all of the business and administrative services reasonably required for the day-to-day operations of his orthodontic practice.  See SPA §§ 8(b), 9(b); BSA, Pl's Mem. Opp., Exh. 2 § 1.1 (hereinafter "BSA").  The support and services that OCS agreed to provide for the practice's day-to-day operations include billing and collection services, see id. § 1.7, bookkeeping and accounting services, see id. § 1.9, marketing advice, see id. § 1.1(i), employing, scheduling and training office staff, see id. § 1.1(ii), office maintenance services, see id. § 1.1(iii), administering and disbursing funds from the PC bank account, see id. § 1.1(vii), computer services, see id. § 1.1(viii), purchasing services for supplies and inventory, see id. § 1.1(ix), assistance in recruiting Associate Orthodontists, see id. § 1.1(x), preparation of statistics regarding the operations of the practice, see id. § 1.1 (xi), routine legal services, see id. § 1.1(xii), and all manner of business consulting services, see id. § 1.1(xiii).  The contract also included an express provision that "OCS is not authorized or qualified to engage in any activity

3

that may be deemed or construed to constitute the 'practice of dentistry' under the applicable laws and regulations of the State of Connecticut."  See id. § 1.2.

Since, under the SPA, OCS had acquired Dr. Christie's leasehold interests in his office and his furniture, fixtures and equipment, the BSA set out an arrangement whereby OCS subleased the office back to Dr. Christie—under essentially the same terms as he had previously leased the office prior to the transaction with OCS—and similarly leased back to Dr. Christie the furniture, fixtures and equipment.  See id. §§ 1.4, 1.5.  The BSA provided that, "subject to the terms of this Agreement, the PC and the Orthodontist shall have exclusive custody of and control over the Furniture, Fixtures and Equipment" and the Offices during the terms of the sublease and leases. Id. §§ 1.4, 1.5.  The BSA further limited Plaintiffs' authority by specifying that OCS could terminate the existing office lease, enter into a new office lease or purchase new furniture, fixtures and equipment only with Dr. Christie's approval.  See id. §§ 2.2(ii) and (iv).

Pursuant to the BSA, OCS also employed and provided to the PC and Dr. Christie "all of the staff reasonably required"—excluding "orthodontists and other licensed personnel (if any) whom OCS is prohibited from employing"—in the orthodontic practice's operations.  Id. § 1.6. The Agreement provided that the staff "reasonably required" would be determined collectively by Dr. Christie and the PC in consultation with OCS.  Id.  Notwithstanding the fact that OCS employed the office staff, Dr. Christie and the PC were responsible for approving—providing that such approval not be unreasonably withheld—the hiring, termination and compensation of the professional and non-professional staff.  Id. at § 2.2.

The financial arrangements between the parties is set out in detail in the BSA.  The Agreement provided that Defendants would "deposit all [] funds collected for or on behalf of the

PC and the orthodontist into an account with a bank." Id. § 1.7.  Pursuant to the BSA, Defendants obtained signatory authority over the funds and took "exclusive responsibility for disbursements and remittances from such accounts for all funds deposited into such accounts." Id. at § 1.8.  Dr. Christie and the PC were prohibited from making any withdrawals or disbursements without first obtaining the prior, express, written consent of OCS.  Id.  Although OCS retained authority over the account, it was only permitted to make such disbursements and remittances as necessary for the payment of the expenses, remittances and fees previously authorized by Dr. Christie and the PC and was required to account to Dr. Christie and the PC for all such disbursements and remittances.  Id.  In consideration for OCS's services, the BSA provided that Defendants would be charged a monthly fee, paid through "cash remittances to OCS from the Administered Funds."  Id. § 3.1.  As is fairly typical in these types of relationships, the monthly service fee is calculated pursuant to an agreed-upon formula and is tied to a percentage of Defendants' net revenues.   See id., Exh. B.  After Plaintiffs had been paid the monthly service fees and reimbursed for expenses authorized by Dr. Christie under the Agreement, the rest of Defendants' net revenues were distributed back to Dr. Christie.  Id. § 3.2. The agreement went on to provide, however, that the above provisions "in no way represent the division, splitting or other allocation of professional fees, and do not in any way relate to patient referrals" and the parties acknowledged and agreed that the fees were negotiated in "arm's length negotiations" and represented the fair value for the services to be provided by OCS.  Id. § 3.4.

Although the BSA provided for a twenty-five year term, either party could terminate the Agreement at any time if the other party breached its duties or obligations under the Agreement and failed to cure the breach in accordance with the Agreement's cure provisions.  Id. § 4.2.  The

BSA also contained mutual covenants not to compete which would remain in effect for the duration of the Agreement and for two years following its expiration or termination.  See id. § 5.2.

Plaintiffs' Complaint asserts claims for specific performance, breach of contract, intentional interference with contractual relations, conversion, promissory estoppel, unjust enrichment/quantum meruit and CUTPA violations based on Defendants' alleged breach of contract by terminating the contractual relationship with Plaintiffs in 2003, prior to the expiration of the twenty-five year period contemplated in the agreement.  Defendants deny Plaintiffs' allegations and make multiple claims in response, including allegations that Plaintiffs materially breached the agreements and that the agreements are unenforceable due to their illegality. Moreover, in their Counterclaim, Defendants allege that Plaintiffs embezzled thousands of dollars "by way of deceitful accounting practices."  In the instant Motion for Summary Judgment, Defendants claim that the action should be dismissed on the grounds that the contracts at issue are illegal and violate the public policy of the state and thus are unenforceable under Connecticut law.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).  A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue."  Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate, Anderson, 477 U.S. at 255, and the court should "draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted).

## III.  DISCUSSION

The threshold issue before the court is whether the Parties' agreements are illegal, and therefore invalid and unenforceable, because they allow Plaintiffs to "own or operate a dental office" and/or "engage in the practice of dentistry or dental medicine" without a license in

violation of Sections 20-106, 20-122 and 20-123 of the Connecticut General Statues.[3]

Connecticut law prohibits any person who is not a licensed and registered dentist and any

corporation that is not a professional service corporation meeting certain requirements (not at

issue here) from owning or operating a dental office.  Conn. Gen. Stat. § 20-122.  Under Section

20-123 of this same statute, any person "who owns or carries on a dental practice or business . . .

shall be deemed as practicing dentistry or dental medicine within the meaning of this chapter."

Regarding the practice of statutory interpretation, the Connecticut Supreme Court has

instructed:

> The process of statutory interpretation involves a reasoned search for the intention
> of the legislature . . . . In other words, we seek to determine, in a reasoned manner,
> the meaning of the statutory language as applied to the facts of the case, including the
> question of whether the language actually does apply. In seeking to determine that
> meaning, we look to the words of the statute itself, to the legislative history and
> circumstances surrounding its enactment, to the legislative policy it was designed to
> implement, and to its relationship to existing legislation and common law principles
> governing the same general subject matter. . . . Thus, we do not follow the plain
> meaning rule.
>
> In performing this task, we begin with a searching examination of the language of the
> statute, because that is the most important factor to be considered. . . . We do not,
> however, end with the language. We recognize, further, that the purpose or purposes
> of the legislation, and the context of the language, broadly understood, are directly
> relevant to the meaning of the language of the statute.
>
> This does not mean, however, that we will not, in a given case, follow what may be
> regarded as the plain meaning of the language . . . . the more strongly the bare text
> supports such a meaning, the more persuasive the extratextual sources of meaning
> will have to be in order to yield a different meaning.

State v. Moran, 264 Conn. 593, 598-99, 825 A.2d 111 (2003) (quoting State v. Courchesne, 262

---

[3]  The question of whether a contract is enforceable, illegal or against public policy is a question of
law and thus is well-suited for disposition on summary judgment.  Parente v. Pirozzoli, 87 Conn.
App. 235, 245, 866 A.2d 629 (2005) (quoting 17A Am. Jur. 2d 312, Contracts § 327 (2004)).

Conn. 537, 577-78, 816 A.2d 562 (2003)).  The statutes at issue are in derogation of a common-law right and penal in nature and thus must be strictly construed.  State of Connecticut v. Faatz, 83 Conn. 300, 302, 76 A. 295 (1910); Mack v. Saars, 150 Conn. 290, 294, 188 A.2d 863 (1963) (citing cases); see also Connecticut Chiropody Soc. v. Murray, 146 Conn. 613, 617, 153 A.2d 412 (1959) ("A statute which restricts the conduct of an occupation which was lawful at common law should be construed with reasonable strictness.").  Although the legislative history and purpose of the legislation should be considered, the statutes should be applied only as far as their words direct—it is not the court's function to read into statutes presumed legislative intentions, modifications, or our own ideas of what might be "wise provisions" in the absence of a clear expression of legislative will.  See Obuchowski v. Dental Commission, 149 Conn. 257, 265, 178 A.2d 537 (1962); Lenox Realty Co. v. Hackett, 122 Conn. 143, 150, 187 A. 895 (1936); Connelly v. Bridgeport, 104 Conn. 238, 249, 132 A. 690 (1926); see also Lee v. Lee, 145 Conn. 355, 358, 143 A.2d 154 (1958) ("Legislative intent is found not in what the legislature meant to say but in the meaning of what it did say.").

Defendants argue that based upon the terms of the SPA and the BSA, OCA and OCS "own" or "operate" a dental office and "own" or "carry on" a dental practice or business in violation of Connecticut General Statutes §§ 20-106, 20-122 and 20-123.  Plaintiffs, in opposition, contend that the BSA explicitly distinguishes between the business and consulting services that OCS provided and the medical and professional services that were provided by Dr. Christie and the New PC.  See Mem. Opp. at 14 (citing BSA, Fourth Whereas Clause, §§ 1.2, 1.6, 2.1, 2.2, 2.6, 3.2(d), (g), 3.4 and 5.9).

The terms "own or operate" a dental office or "own or carry on" a dental practice or

9

business are not defined in the Connecticut General Statutes.  It is appropriate, when a statutory term is not defined, to look to the "common understanding" of the term as expressed in the law and in dictionaries.  Connecticut Nat'l Bank v. Giacomi, 242 Conn. 17, 33, 699 A.2d 104 (1997); see also Conn. Gen. Stat. § 1-1(a) ("In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language.").  "Own" is generally defined to mean "to have or hold as property or appurtenance," "[t]o have or hold as one's own," "to have a rightful title to, whether legal or natural," "to have belonging to" and "to possess." Webster's Third New International Dictionary (2002) (hereinafter "Webster's 3d"); Oxford English Dictionary (2d ed. 1989) (hereinafter "OED 2d").  "Operate" is generally defined to mean "to perform a work or labor," "exert power[, force] or influence," and to "produce an effect."  Webster's 3d; OED 2d.  "Carry on" is generally defined to mean "to continue one's course or activity" or "[t]o continue or advance (a proceeding) from the stage already attained." Webster's 3d; OED 2d.  The Connecticut Supreme Court has said, however, that "[t]he word 'owner' has no fixed meaning but must be interpreted in its context and according to the circumstances in which it is used."  Warren v. Borawski, 130 Conn. 676, 679, 37 A.2d 364 (1944).

        In order to apply the terms to the case, we must engage in the "reasoned search" for the legislature's intent discussed in Moran, 264 Conn. at 598.  This process involves a "searching examination of the language of the statute," a determination of "the purpose or purposes of the legislation" and attention to "the context of the language."  Id. at 599.  The general purpose of the statutes regulating the practice of dentistry is to protect the health, safety and welfare of Connecticut citizens and the reputations of dentists licensed within the state by ensuring that

10

practitioners meet certain minimum standards.  See Amsel v. Brooks, 141 Conn. 288, 106 A.2d

152 (1954); see also State v. Faatz, 83 Conn. 300, 76 A.2d 295 (1910) ("The Act is intended to

protect the dental profession from ignorant and incompetent practitioners, as well as to protect

the public against the same kind of ignorance and incompetence . . .").  The public policy behind

the statutes is also evident in the legislative history.  On the question of whether § 20-122 should

have been repealed, Dr. John Barry, Jr., of the Connecticut State Dental Association, stated:

> If the current restrictions on ownership were removed, then non-dentists would be
> permitted to become owners of dental practices . . . . They could, therefore, insist
> upon a voice in professional as well as managerial aspects of the practice.  Since the
> non-dentist entrepreneur's prime concern would be the profit making interests of his
> shareholders, public assurances of a single standard of care could not be guaranteed.
> At times the interest of non-dentist owners might conflict with professional standards
> of care.

Conn. Joint Standing Comm. Hearings, Government Administration and Elections, Pt II, 1980

Sess., at 492.

Since the language at issue here is ambiguous, the purpose and context must be

considered when applying the statute to this case.  Importantly, the terms "owns," "operates" and

"carries on" should be construed in a manner that furthers the avowed purposes of the statutes,

namely, to ensure that dentists retain ownership and control over the professional aspects of the

practice in order to maintain a high standard of care.

The agreements and the parties' working relationship reveal a distinction between the

business services of the practice, performed by Plaintiffs, and the medical and professional

aspects of the practice, over which Dr. Christie maintained sole ownership and control.  After

closing the SPA and the BSA, Dr. Christie remained the sole owner and operator of the dental

practice, whereas OCS' relationship to the practice was more akin to that of an independent

contractor.  See BSA § 5.9.  OCS did not employ Dr. Christie and did not make professional decisions for the PC.  The dental practices' patient records and patient contracts remained in Dr. Christie's ownership and it was Dr. Christie, not OCS, who employed the orthodontists and dentists who worked at the office.  See id. § 2.1(i).  Importantly, Dr. Christie continues to retain authority over all decisions relating to the practice's business operations—including those decisions in which OCS assisted.  See id. §§ 2.2, 2.7.  It is clear, therefore, that under the parties' agreements, OCA and/or OCS were not entitled to exert control or ownership over Dr. Christie's orthodontic practice consistent with the public policy considerations of § 20-122.

The BSA is clear in stipulating that OCS shall provide "the business and administrative support and services reasonably required by the Orthodontist and the PC for the day-to-day operations of the Practice."  See id. § 1.1.  Although OCS and Dr. Christie agreed that OCS would provide a wide variety and a great deal of services to Dr. Christie's practice, those services were strictly limited to "business and administrative support" and, importantly, did not infringe upon the professional aspects of the practice.  The parties also expressly agreed that OCS was not authorized to and would not engage in any acts constituting the "practice of dentistry" as defined by Connecticut laws.  See id. § 1.2.[4]  The activities and functions performed by Plaintiffs, while helping to ensure the dental practice ran smoothly, efficiently and economically, did not have a

---

[4]    Section 1.2 of the BSA specifically provides: "The parties expressly acknowledge that OCS is not authorized or qualified to engage in any activity that may be deemed or construed to constitute the 'practice of dentistry' under the applicable laws and regulations of the State of Connecticut.  In the event that any term of this Agreement is held by a court or other governmental authority of competent jurisdiction to constitute the 'practice of dentistry' under the applicable laws and regulations of the State of Connecticut, or if legal counsel to OCS and the Orthodontist and PC mutually agree to the same, then such term shall be deemed waived and unenforceable and the nonperformance thereof shall not constitute a breach or default by OCS under this Agreement . . . ."

direct, immediate and tangible effect upon the actual care and treatment received by Dr. Christie's patients.

OCS leased the furniture, fixtures and equipment and subleased the offices and premises to Dr. Christie and the New PC, however, it appears that it acquired an interest in such property for the purpose of fulfilling its obligation to provide business and administrative support and services, a purpose not at odds with Connecticut law.  See id. §§ 1.4, 1.5.  For example, the BSA provides that "OCS shall maintain, or arrange for the maintenance of, the Furniture, Fixtures and Equipment in good working order, condition and repair," "pay all license fees, assessments, charges and taxes which may be imposed," and "keep the Furniture, Fixtures and Equipment insured against risk of loss or damage," but stipulates that, as was the case before entering into the agreement, "the PC and the Orthodontist shall have exclusive custody and control over the Furniture, Fixtures and Equipment during the term hereof."  Id. § 1.4.  Similar terms governed the office lease, which OCS acquired and, in addition to agreeing to keep the offices in good working order, agreed to pay the lease each month.  Id. § 1.5.  Importantly, however, Dr. Christie and the New PC similarly retained "exclusive custody of and control over the Offices during the applicable term of the sublease."  Id.  This division of duties, responsibilities and control suggests that the aforementioned transfers and assignments of property was done not to transfer ownership or to circumvent the statute but rather to allow OCS to undertake its business and administrative support duties in the most effective and efficient way possible.  Plaintiff's "ownership" of the tangible assets is severely limited by the fact that the control over their use in rendering dental services is entirely limited to Dr. Christie.

To "own" is defined as "to have belonging to," "to possess" or "to have control over."

Webster's 3d; OED 2d; <u>Penny v. Orthalliance, Inc.</u>, 255 F. Supp. 2d 579, 582 (N.D. Tex. 2003)

(quoting The American Heritage Dictionary of the American Language (4th ed. 2000)).

Although Plaintiffs had acquired title to the furniture, fixtures and equipment and took over the

office lease, it is clearly Dr. Christie who "possessed," "had belonging to" and "had control over"

the physical assets of the practice.

Other provisions in the BSA support our conclusion that it was not the parties' intention

to contravene the law, but only to enable OCS to provide practice-management services in an

effective manner. For example, the BSA provides that OCS will employ "all of the staff

reasonably required for the Practice's operations," but specifically exempts "orthodontists and

other licensed personnel (if any) whom OCS is prohibited from employing under applicable state

dental laws and regulations." <u>Id</u>. § 1.6.[5]

Defendants argue, based on the fact that Plaintiffs have signatory authority over a joint

bank account connected to Dr. Christie's practice, that Plaintiffs are illegally operating or

carrying on a dental practice. The BSA provides that Dr. Christie and the New PC "shall be

responsible for the billing and collections of all fees and charges generated in respect of

orthodontic care and orthodontic treatment . . . except to the extent that OCS has been requested

by the Orthodontist and the PC to provide billings and collections of amounts billed to insurance

companies and other third party payors . . ." BSA § 1.7. In order to facilitate OCS' ability to

provide these services and specifically, to permit OCS to deposit collected money into the

accounts and to pay certain practice expenses, Dr. Christie granted OCS signatory authority over

_____

[5]      It is clear, both from the language of the statute and from the Attorney General's Opinion that
employing staff is not prohibited by Connecticut law.

the Insurance Collections Account and the PC Account.  Id. § 1.8.  OCS could only make such payments as were authorized by Dr. Christie and was required to account to him for all deposits into and all disbursements from the accounts.  Id.  Although Plaintiffs may have been involved in the operation of the practice, it is Dr. Christie, by retaining ownership and control, who owned, operated and carried on the practice.

Other provisions in the BSA support the conclusion that, notwithstanding the large amount of services performed by Plaintiffs, Dr. Christie retained ownership and control over the key aspects of the practice.  For example, the BSA gave Dr. Christie exclusive control over a great deal of the practice's operations, including the hiring and termination of all dentists and orthodontists, the rendering of all professional orthodontic and dental services to patients, including decisions concerning the types of orthodontic treatment and services provided to patients and the types of drugs, supplies and equipment used in providing dental services to patients, the professional supervision of the practices's staff, the fees charged to patients, all policies concerning refunds and discounts, and the preparation and maintenance of all clinical dental records.  Id. § 2.1.  Moreover, Dr. Christie and the PC were granted approval—providing that it not be unreasonably withheld—over the hiring, termination and compensation of the practice's professional and non-professional staff, including the office staff, entering into and terminating office leases, the acquisition of furniture, fixtures and equipment, and marketing.  Id. § 2.2. Generally, it appears that Plaintiffs assumed the power and authority necessary to manage the business affairs of the orthodontic office, but disclaimed control over decisions relating to patient treatment and other professional aspects of the practice.

A Connecticut Attorney General Opinion from 1987 is helpful in several respects.[6]  In finding that private corporations' practice of employing licensed dental hygienists and providing their services to licensed dentists on a temporary basis for a fee was permissible, the Opinion emphasized that the corporations lease out the services of the dental hygienists and that no dental services are practiced at the corporate offices.  See 1987 Conn. Op. Atty. Gen. 271, 1987 WL 341272 (Conn. A.G.).  Although not specifically at issue, the Opinion discussed Connecticut General Statutes Sections 20-122 and 20-123 as well.  As in that case, Plaintiffs here not only do not provide dental services at the corporate offices, but do not provide dental services *at all*—unlike the dental hygienists referenced in the Opinion.  In finding that Section 20-122 was not violated, the Attorney General also relied on the fact that the licensed dentists, not the private corporations, owned and operated the offices at which the dental services were performed.  Id.[7] Although Plaintiffs own some of the practice's tangible assets in this case, it is Dr. Christie who owns the New PC, and thus, the professional aspects of the practice.

Rendering dental services to patients requires substantial logistical support.  The agreements at issue reserve to Dr. Christie all aspects of the professional dental services provided

---

[6]   In addition to the findings discussed below, the Opinion also questioned whether Section 20-123 actually applied to a corporation, noting that unlike other provisions of the Connecticut statutes, it did not distinguish between a person and a corporation.  Id.  The Attorney General did note, however, that Connecticut General Statute Section 1-1(k) provides that the word "person" may extend and be applied to corporations.  Moreover, the court in Tru-Fit Plastics applied Section 20-123 to a corporation without discussion, although the Attorney General noted in regard to that case that the defendant was never identified as a corporation in the complaint or in the parties' stipulated statement of facts.  Id.  Although the Attorney General declined to offer an opinion on that issue, we assume, for purposes of this Ruling, that Section 20-123 may properly be applied to a corporation.

[7]   Responding to the question, the Opinion states: "Section 20-122 involves the 'ownership' or 'operation' of a dental office. The operation of the dental office is conducted by the licensed dentist. Thus, the employment, however one wishes to define it, of dental hygienists by these private corporations is not a violation of § 20-122."

16

to patients.  Plaintiffs have contracted to provide the logistical support which enables, and frees,

Dr. Christie and any professionals, such as hygienists, technicians and the like, to provide to

patients the appropriate, necessary and requested dental services.  Thus, while a hygienist, for

example, is paid by Plaintiffs, has his or her social security taxes calculated and paid by Plaintiffs

and has his or her insurance arranged and paid for by Plaintiffs, the professional standards

applied to his or her employment and the treatment he or she renders to patients remain in the

exclusive determination and control of Dr. Christie.  Nothing in the agreements provides for or

permits Plaintiffs to intrude on any aspect of the professionals' treatment of or dealings with

patients with respect to their dental needs.  Such control remains solely within the province,

determination and control of Dr. Christie and any professional assistants whose dental activities

and services remain under the direction and control of Dr. Christie.  Contracts which only

provide logistical support for the rendering of dental services do not conflict with Connecticut

dental laws nor do they affect the dental services rendered to patients, who remain protected by

the professional standards to which Dr. Christie and his professional staff are held.

    A.  <u>Connecticut Courts' Interpretation of the Statutory Provisions</u>

        The specific provisions at issue in this case have been interpreted by the Connecticut

courts in only a small number of cases.  In 1910, the Connecticut Supreme Court interpreted an

earlier version of the current § 20-106, which provided that "no person shall engage in the

practice of dentistry unless such person shall have first obtained a license from the dental

commissioners."  <u>See</u> <u>Faatz</u>, 83 Conn. 300.  In <u>Faatz</u>, which involved an unlicensed man who

performed a "dental operation," the court said that a person "cannot, within the meaning of the

statute, be said to 'engage in the practice of dentistry' until he embarks in it, until he holds

17

himself out as a dentist, either by a series of continuous acts, covert or open, or by advertising himself in some way as a dentist or as a doctor of dental surgery." Id. at 305.  The court also went on to caution that "if properly and legitimately enforced," the statute "is a useful one; but it should not be strained by construction to include terms and restrictions not intended by the legislature . . . . The question is not what the legislature actually meant to say, but what is the meaning of what the legislature has said." Id. at 305-06.[8]

In Obuchowski v. Dental Comm'n, 149 Conn. 257, 178 A.2d 537 (1962), the plaintiff was a dentist whose license had been suspended for ninety days after being charged with violating Connecticut General Statutes Sections 20-121, 20-122 and 20-119. Id. at 261.  It was found that a licensed dental hygienist, "Mrs. Sweeney," was the true owner and operator of a dental practice, with the plaintiff-dentist acting merely as a "figurehead." Id.  This finding was based on the facts that the plaintiff paid the income to Mrs. Sweeney in cash each week, after which she would deposit enough money into his account to cover the practice's expenses, the plaintiff would give Mrs. Sweeney a check to pay the rent, which she would deposit into her account and pay the rent with her own personal check, and importantly, before and during the plaintiff's association with the dental practice, "Mrs. Sweeney [] personally conducted the dealings with customers, examining dentures brought in for repair, giving prices on the cost of the work, delivering the repaired dentures to the customers and receiving payment for them." Id. at 263.  The Court found that "[i]n conducting the operations under his own name . . ., the plaintiff violated § 20-121, which prohibits the operation of a dental office under any other name

---

[8]     As noted in Jones v. Dental Comm'n, 109 Conn. 73, 75, 145 A. 570 (1929), the legislature amended the statute following Faatz, expanding the definition of the "practice of dentistry" to include conduct such as performing one operation, as was the case in Faatz.

than that of the dentist or dentists actually owning the practice and practicing therein." Id. at 264.

Although the court found that the parties' arrangement violated Section 20-121, Mrs. Sweeney was clearly engaging in more extensive dental practices that are Plaintiffs in this case. Significantly, Plaintiffs do not do any dental work, do not deal personally with patients, do not examine, repair and deliver dentures, and do not set prices for dental procedures.  Moreover, Plaintiffs do not own Dr. Christie's practice.  Although they "own" the Old PC, which includes the physical assets of the practice (e.g., furniture, equipment, leasehold), Dr. Christie is the sole shareholder of the New PC, which owns the practice's professional assets (e.g., patient contracts, provider agreements).  SPA § 2(b).  Dr. Christie remains engaged in the practice of dentistry, free from any right of Plaintiffs to control, direct or intrude, however, this was not the case in Obuchowski.  In that case, it was Ms. Sweeney who had the authority and ability to exercise control.  The professional practice of dentistry should be distinguished from the business and management services conducted by Plaintiffs here.

Another case, Dental Comm'n v. Tru-Fit Plastics, Inc., 159 Conn. 362, 365-66, 269 A.2d 265 (1970), held that the defendant was not engaged in the "practice of dentistry."  The defendant in that case was a plastics company which sold "spare denture kits" comprised of molds and instructions on how to fashion a "spare denture" using an existing denture and the materials in the kit.  In holding that the defendant company did not violate the statute, the Court emphasized that "[t]he controlling point is that the statute makes no mention of one who assembles, packages and sells, with appropriate instructions, the materials from which an individual may, if he wishes to attempt to do so, fashion a duplicate of his own denture."  Tru-Fit Plastics, 159 Conn. at 366. This case, though limited in its application, shows the strict construction that Connecticut courts

give to the dental statutes and their effort not to stretch its meaning beyond its stated purpose.

     B.  <u>Non-Binding Cases from Other Jurisdictions</u>

     Both Plaintiffs and Defendants cite several cases from other Districts in support of their respective positions.

     <u>Orthodontic Affiliates</u>, 210 F. Supp. 2d 1054, a case from the Northern District of Indiana, recently held that an arrangement similar to the one at hand did not violate an Indiana law barring the unauthorized practice of dentistry.  The plaintiff in <u>Orthodontic Affiliates</u> was an Indiana professional corporation whose members are orthodontists.  <u>Id</u>. at 1056.  The defendant, Orthalliance, Inc., was "the nation's second-largest orthodontics practice-management company." <u>Id</u>. (internal citations omitted).  The plaintiff, in its complaint, alleged that the parties' management service agreement called for the defendant to engage in the practice of dentistry in violation of Indiana law, and sought a declaratory judgment stating that the service agreement was invalid and unenforceable.  The Indiana law at issue was Section 23(a) of the Indiana Dental Practices Act ("IDPA"), which provides, in pertinent part: "A person is practicing dentistry within the meaning of this chapter if the person . . . (13) exercises direction or control over a dentist through a written contract concerning . . . (F) final decisions relating to the employment of dental office personnel." <u>Id</u>. at 1058 (quoting Ind. Code Ann. § 25-14-1-23 (West 2003)).

     In granting the defendant's motion for summary judgment, the court relied on the Indiana statute and on case law, which "suggest[ed] a distinction between the professional pursuit or dentistry, and the business objectives necessarily intertwined with such a practice," and concluded that "IDPA only intends to regulate the former."  <u>Id</u>. at 1059.  Accordingly, the court found that "dental office personnel," as used in IDPA, refers only to persons such as hygienists,

dental assistants and technicians and not to secretarial staff, receptionists and accounts payable/receivable clerks.  The court then turned to the service agreement, which provided that the defendant "shall provide . . . support personnel . . . to manage the business affairs . . . subject to the requirements of the applicable provisions of Indiana law relating to the practice of dentistry" and that "USOC shall employ all of the Center's staff, except the Orthodontists."  Id. at 1059-60.  The court held that since the defendant was contractually obliged only to render business services and to provide business personnel, subject to Indiana law, these provisions did not violate IDPA.  Id.  In so finding, the court noted also that although the term "staff" is "ambiguous when considered in isolation," in the context of the agreement, it clearly "only relates to business personnel."  Id. at 1060.  Similarly, the court relied on a deposition statement made by one of the orthodontists indicating that the orthodontists retained "exclusive control" over the dental practice.  Id.[9]  Although this case is informative, both the agreements at issue and the relevant statutory authority differ from those at issue in this case.   Specifically, the Indiana provision regulating the practice of dentistry is more specific and much narrower than the Connecticut law at issue in this case, making it difficult to analogize the two cases.

Unlike Orthodontic Affiliates, Penny v. Orthalliance, Inc., 255 F. Supp. 2d 579 (N.D. Tex. 2003), held that a similar management arrangement did violate the applicable Texas laws regulating the practice of dentistry.  Again, the plaintiffs were orthodontists, the Defendant was Orthalliance, Inc., the same defendant corporation as in Orthodontic Affiliates, and at issue were

---

[9]     The court also held, in the alternative, that "[e]ven assuming that entering into employment contracts with orthodontists constitutes unauthorized practice of dentistry, it was Plaintiff who agreed to engage in the unlawful act. . . . If this act constitutes an unauthorized practice of dentistry, Plaintiff is the culpable party, and as a result, it has no remedy."  Orthodontic Affiliates, 210 F. Supp. 2d at 1060.

several agreements that the parties had entered into, namely a "Purchase and Sale Agreement," a

"Service Agreement" and an "Employment Agreement."  Id. at 579-80.  Under the relevant

Texas statute, Sections 251.001, et seq. of the Texas Dental Practices Act ("TDPA"), a person is

prohibited from practicing dentistry without a valid license.[10]  Id. at 581 (citing Tex. Occ. Code

Ann. § 251 et seq.).  Applying rules of statutory construction similar to the ones used in

Connecticut, the court held that the "unambiguous language of the statute prohibits a dentist's

employment or engagement under *any* type of contract at an office owned, maintained, or

operated by non-licensed persons," emphasizing that "[t]he legislature's deliberate wording of

the TDPA indicates its intent to broadly prohibit a dentist's employment or engagement by a non-

licensed person."  Id. (emphasis in original).

　　　　Applying its broad reading of the statutory provisions to the agreements at issue, the court

found that all of the agreements violated the TDPA and were therefore illegal. Id. at 582.

Specifically, the court held that the Purchase and Sale Agreement violated the TDPA by

transferring all of the tangible assets of the orthodontic offices—and thus transferring

"ownership" of the offices—to Orthalliance.  Id.  "By virtue of possessing title to the offices'

assets and controlling these assets in accordance with the Service Agreements," the court said,

"Orthalliance owns the orthodontic offices."  Id.  Moreover, the court found that the Service

Agreements violated the TDPA because they obligated Orthalliance to "operate and maintain the

orthodontic offices."  Id.  Finally, the court held that the Employment Agreements violated the

---

[10]　　　The TDPA sets out several categories of activities that constitute the "practice of dentistry,"
including, as is pertinent here, "own[ing], maintain[ing], or operat[ing] an office or place of
business in which the person employs or engages under any type contract another person or
persons to practice dentistry . . ."  Tex. Occ. Code Ann. § 251.003(4).

TDPA because they required the individual plaintiff orthodontists to remain employed at Orthalliance's offices for an initial term of five years, thus permitting Orthalliance to contravene the TDPA by impermissibly engaging the individual plaintiffs.[11]  Id. at 582-83.  Finding the agreements to be "illegal in their entirety," the court emphasized that "[t]he Parties seek to accomplish in a trilateral contract that which they cannot in a bilateral contract, an express written employment contract," when the TDPA was "expressly phrased to prevent parties from circumventing the corporate practice of dentistry through indirect business relationships."  Id. at 583.

Although the Ohio law is phrased quite differently from the Connecticut provisions at issue here, an Opinion issued by the Attorney General of Ohio is also instructive.  The Attorney General found that "[t]he existence of a management agreement between a licensed dentist and an unlicensed entity, which is not wholly owned by licensed dentists, pursuant to which the unlicensed entity provides business or management services to the licensed dentist, does not, per se, violate [Ohio law]."  1995 Ohio Op. Atty. Gen. 95-045, 1995 WL 783022 (1995).  The Ohio law, like Connecticut law, prohibits unlicensed persons from practicing dentistry.  The Ohio law also provides, however, that any person who is a "manager, proprietor, operator, or conductor of a place for performing dental operations" illegally "practices dentistry."  O.R.C. § 4715.01.  The Ohio law then goes on to identify three situations in which one qualifies as a "manager, proprietor, operator, or conductor," under the provision.  In view of that statutory provision, the Attorney General found that "[t]he single fact that a management company furnishes business or

---

[11]    The court noted that "Orthalliance may also employ the Individual Plaintiffs; however, the Court shall not decide this issue, because Orthalliance clearly engages the Individual Plaintiffs."  Penny, 255 F. Supp. 2d at 583 n.5.

management services to a professional corporation or other entity that employs licensed dentists does not compel the conclusion that the management company is a 'manager, proprietor, operator, or conductor of a place for performing dental operations under [O.]R.C. [§] 4715.01."

C.  Application of the Statutes and Case Law to the Facts of this Case

The cases from other states make for problematic comparisons because they involve statutes and modes of statutory interpretation that are different from those found in Connecticut. The statutes at issue in this case broadly prohibit unlicensed persons from "own[ing] or operat[ing] a dental office, or an office, laboratory or operation or consultation room in which dental medicine, dental surgery or dental hygiene is carried on as a portion of its regular business," and from practicing dentistry, defined, as relevant here, as simply "own[ing] or carr[ying] on a dental practice."  Conn. Gen. Stat. §§ 20-106, 20-122, 20-123.  The statutory provisions are less specific—and thus potentially more broad—than the similar statutes from the cases discussed.  The most closely relevant Connecticut opinions, however, take a strict, narrow reading of the statutes designed to further the legislative intent, shedding a slightly different light on the situation than would the statutory language taken alone.  Specifically, the Connecticut cases have generally applied the statutes more strictly when the unlicensed person or entity is infringing on the professional aspects of the practice of dentistry, emphasizing activities such as "hold[ing] himself out as a dentist," "personally conduct[ing] dealings with customers," and "examining dentures."  See Faatz, 83 Conn. at 305; Obuchowski, 149 Conn. at 263.

In light of these various authorities, this Court finds, based on the facts presented here, that OCA and OCS do not "own or operate" or "own or carry on" the dental practice and thus do not violate the Connecticut statutory provisions.  It appears, from the evidence submitted, that the

24

obligations undertaken by Plaintiffs were no different from those that dentists typically seek assistance with.  The only thing distinguishing Plaintiffs from more traditional providers of office management services is the fact that OCA and OCS provide the complete range of practice management services, with the result being that dentists can contract with just one company rather than entering into separate contracts with various providers on a piecemeal basis.  None of the services performed by Plaintiffs, when considered in isolation, would contravene the law.  It is difficult to imagine, therefore, that the mere fact that one company provides all of the services at issue would render the arrangement illegal.

If, as Defendants suggest, this Court were to follow the reasoning of the Penny court and these agreements held to be illegal and unenforceable, such a ruling could have broad implications.  For example, a landlord who leased premises for the conduct of a dental practice and was thereby obliged, pursuant to the lease agreement, to maintain the premises, could arguably be held to "own" or "operate" a dental practice.  So also an accounting firm which completely administered the rendering of bills for dental services, collected from insurers, kept the books and paid operating expenses.  Just as those services do not constitute "owning" or "operating" a dental practice, neither do the ones at issue here.

Although Plaintiffs have inserted themselves fairly substantially into Dr. Christie's practice, they have done so only as much as necessary to assist him in the day-to-operations of his business.  For example, Plaintiffs employ Dr. Christie's clerical and administrative staff and provide them to him in order to remove the burden of payroll processing and to afford him the ability to provide his staff with insurance and employee benefit programs more like those provided by larger companies.  Similarly, although Plaintiffs acquired Dr. Christie's office lease

and sublease the office back to him, this was done in an effort to relieve him of the burden of dealing with real estate issues and handling lease negotiations and in order to obtain more favorable lease terms.  Importantly, Dr. Christie retained exclusive custody and control over the dental office, as well as the furniture, fixtures and equipment used therein.  See BSA §§ 1.4, 1.5. Defendants argue that Plaintiffs are illegally "operating" or "carrying on" a dental practice in violation of Connecticut General Statutes §§ 20-122 and 20-123.  To "operate" means to "exert power, force or influence."  Webster's 3d; OED 2d.  According to the BSA, although Plaintiffs assist in a great deal of the practice's day-to-day operations, it is Dr. Christie and the New PC who exert power and force and who ultimately control the operations of the practice.  Moreover, it seems that the "operation" of a dental office must include, in some sense, the key act of performing the professional, dental services that set a dental office apart from any other business. Therefore, it seems that Plaintiffs' activities furthered the innocuous purpose of assisting Dr. Christie with the day-to-day operations of his practice, leaving the professional practice of dentistry firmly in his hands.  It is difficult to imagine that the legislature, when enacting the Connecticut dental statutes, intended to prohibit the sorts of practices at issue here.

## IV.  CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. No. 27] is **denied**.

SO ORDERED.

Dated at New Haven, Connecticut, February  16 , 2006.

/s/
_____
Peter C. Dorsey, U.S. District Judge
United States District Court

26